**Federal Defenders**
OF NEW YORK, INC.

Eastern District
One Pierrepont Plaza -16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1204 Fax: (718) 855-0760

---

Tamara Giwa
*Executive Director and*
*Attorney-in-Chief*

*Eastern District of New York*
Michelle A. Gelernt
*Interim Attorney-in-Charge*

August 1, 2025

**VIA ECF & EMAIL**

The Honorable Ramon E. Reyes, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Jason Rodriguez*, No. 24-CR-79 (RER)

Dear Judge Reyes:

Jason Rodriguez thought that he could make it as a professional investor. For several years before the events of this case, he daytraded his own money in foreign-exchange and Cryptocurrency markets. This side hustle produced a decent income to supplement his salary as an officer with the New York City Police Department. But after he resigned from the NYPD in 2019, following a workplace injury and management dispute about his eligibility for active duty, he decided to try and invest his money full-time. He believed he could match and even exceed his police officer's salary if he committed completely to trading. After years of treating investment as a hobby, he was ready to bet on himself.

At around the same time, Jason struck up a friendship with Edwin Carrion. Edwin was a self-professed entrepreneur. On his social-media pages, he boasted about his self-made riches in real estate, transportation, and gold coin ventures. He offered guidance about how to start a business and make an existing business bigger and better. He glamorized the life he had apparently built, showing off pictures and videos of large homes, exotic travels, and luxury automobiles, boats, and jewelry. He promised his followers that, through his mentorship, he could lead them to the same riches.

Through their friendship, Edwin learned about Jason's professional daytrading and saw an opportunity. He proposed that Jason could make more money if he had more capital: the larger his trade wagers, the greater the potential return. And he suggested how Jason could raise this capital: by creating a company that borrowed money to be traded in exchange for regular interest payments. The proposal was not novel. Edwin had raised money for other ventures using the same loan structure. As Edwin pitched the company, Jason would be principally responsible for the company's trading, and he would run the company's finances and legal compliance. As Edwin proposed and memorialized in TTT's founding documents, Jason would be the chief operating officer, while he would be the chief executive.

Jason accepted Edwin's proposal, and, in March 2020, Edwin incorporated their venture in Florida as Technical Team Trading LLC. In April 2020, Edwin opened a trading account for TTT on Trading Platform 1 and, in July 2020, opened a TTT trading account on Trading Platform 2. In opening both accounts, Edwin misrepresented TTT as only investing money personally held by him and Jason, and not capital contributed by third parties.

The company began with loans that Edwin collected from a person he knew: $200,000 in April and June 2020 from the lender identified as Victim-4 in paragraph 26 of the PSR. The company's initial strategy was to make relatively small foreign-exchange trades—essentially, bets about how one currency would move relative to another—on a short-term basis. Jason typically held his trade positions for 24 hours or less. The amount earned or lost on a trade was within one or two percentage points of the company's total assets. And because the company made relatively small trades on short timetables, the company's capital—*i.e.*, the loan principal—was protected from major risk.

But there was a fundamental flaw in the company's design. TTT promised to pay its lenders 2% of the principal every month from its trading returns. This required the company to consistently make strong earnings, month after month. For example, by June 2020, TTT was responsible for paying its first lender, Victim-4, $4,000 every month for the $200,000 he had deposited. By September 2020, after Victims-5, -6, -7, -10, and -11, had lent another $490,000 to the company, TTT had to profit at least $13,800 on its trades every month just to satisfy its interest obligations.

This was a demanding expectation of return that required the company to profit consistently, without fail. And, despite Jason's prior gains as a daytrader, TTT's trades did not earn the required profits to repay its lenders. Indeed, TTT failed to earn much profit at all in its first year. And by the company's end, its repeated poor trades led it to lose all of its capital.

TTT's flaws were apparent from the beginning. In the company's first year of existence—from April 2020 through March 2021—it yielded a trading profit of about $60,000.[1] But during that time period, the company owed interest payments of approximately $153,000 to its lenders.[2] TTT's first year showed that the company was not capable of earning enough money to pay the enormous interest rates it had promised. Nor did the company make enough money to pay Jason an income. Instead, Jason and Edwin drew directly from the company's loan principal to pay interest obligations and themselves. In particular, Jason converted loans deposited in his personal bank account for his own personal use and expenses. *See* PSR ¶ 23.

---

[1] This is based upon the following calculation. From April 2020 through March 2021, TTT lost $19,622.29 on Trading Platform 2 but earned $80,305 on Trading Platform 1, producing a total trading profit of $60,682.71. *See* Ex. D.

[2] This assumes the following payment schedule, based on a 2% monthly interest obligation for loans received as of the prior month: in May and June 2020, TTT owed $2,000 in monthly interest to Victim-4; in July and August, it owed $4,000 to Victim-4; in September, it owed $13,800 to Victims-4, -5, -6, -7, -10, and -11; in October and November, it owed $19,200 to Victims-4, -5, -6, -7, -10, -11, -20, and 21; in December 2020 and January 2021, it owed $20,200 to Victims-4, -5, -6, -7, -10, -11, -20, -21, and -22; in February 2021, it owed $24,200 to those same nine victims; and in March 2021, it owed $24,400 to those same nine victims. *See* Ex. E.

Facing the reality that TTT was seriously underperforming expectations, Edwin and Jason had two choices. They could admit that TTT had failed, wind down the company, and repay lenders their principal. Or they could persist in the hope that the company would eventually succeed, despite its investment history. Unfortunately, they chose the latter course. And in doing so, the company made two significant changes that turned what had merely been a small business failure into an unmitigated legal calamity.

First, Jason, with Edwin's input and consent, altered the company's trading strategy. From its inception until the end of January 2021, TTT typically entered into relatively small, short-term trades that it held for no more than 24 hours. This reduced the risk of potentially large losses but also limited the size of its potential gains. Beginning toward the end of January 2021, however, TTT began placing bigger trades. This periodically led to larger profits. But it more frequently caused even larger losses, which the company magnified by holding onto its losing positions for extended periods—for weeks, months, even sometimes over a year—while hoping, against evidence, that the trade would swing back in the company's favor. For example, on August 9, 2021, TTT lost $920,000, representing nearly 40% of the company's total capital, in approximately two dozen trades on Trading Platform 2. Seven of those trades had been held open for over a month—four had been open nearly six months—and another seven lost between $85,000 and $100,000 each. Two months later, on October 20 and 21, 2021, TTT again lost about 40% of its capital—this time, over a million dollars—on 15 trades on Trading Platform 2 that had been open for one to three weeks. TTT never experienced gains that were commensurate with these losses.

The second action that Jason and Edwin took to keep TTT afloat was soliciting more lenders and new loans on slightly lower, but still very demanding, interest-payment plans. This influx of capital substantially increased the company's debt, most of which was put toward its trading ledgers. The loans gave TTT more capital to wager and, they hoped, more earnings to repay the company's previous and new lenders. But because their trades never profited as they had hoped, Jason and Edwin continued applying the company's new debt to its old interest obligations. In this respect, TTT functioned as a pyramid scheme.

To obtain the loans it needed to prop up their failing business, Jason and Edwin misrepresented the state of their company to its lenders. They assured TTT's lenders that their loans were low risk because the company did not hold trade positions for more than a day, only wagered 1% of its total capital on a single trade, and kept a reserve fund to protect against losses. Those statements were untrue, as Jason admittedly knew. At the time, the company had wagered and lost substantial portions of its capital on a relatively small number of trades it had held open for weeks or months at a time. And TTT had never maintained a separate reserve account, much less one with sufficient assets to guarantee full reimbursement of the lenders' principal.

In making these false statements and using new loans to pay prior interest obligations, Jason looked to Edwin, his mentor and a self-proclaimed business developer, for guidance. At no point did Edwin express any hesitation to Jason about what they told lenders or how TTT used its loans. Jason took Edwin's willing participation as a license. Although Jason understood the law on New York City streets from his time in NYPD, he was less confident about the rules governing business and commodities trading. But he assumed that if TTT's business practices were illegal, Edwin, whose brand and image centered on his purported personal integrity and

3

depths of experience, would have been the first to object. That he never did led Jason to believe that what they were doing was either permissible or, at least, unlikely to get them in trouble.[3]

The increased loans, bigger trades, and longer-held positions never resulted in success for TTT. On the contrary, the company did precipitously worse. Between April 2021 and March 2022, the company lost money every month, except for July, on Trading Platform 1. And during this period, TTT lost approximately $2 million on Trading Platform 2. Jason tried earnestly to make trades that would generate the necessary profit to keep the company afloat. But the debt and interest payments were too great, and his trading skill and strategy were inadequate to the task. By the time TTT ceased operations in October 2022, the company had received nearly $5 million in loans but had only repaid lenders approximately $1.5 million. When the company shuttered, it owed just under $3.5 million in principal to its lenders.

Since the company's demise, Jason's life has cratered. He has no assets. He is unemployed and living in his parents' home. He has been sued by the Commodities Futures Trading Commission for the same conduct underlying this prosecution. Friends who lent money to TTT or simply heard about this case have shunned him. His general reputation, which he had burnished over seven years as a police officer, is ruined. He is a pariah to many in his community. And that economic and reputational damage precedes the punishment this Court ultimately will impose.

As explained below, a below-guidelines sentence is sufficient, but not greater than necessary, to adequately punish this crime. Even though Jason faces an advisory range of 78-97 months' imprisonment, the Sentencing Guidelines' recommended term far exceeds what is required to achieve the purposes of sentencing. Indeed, its emphasis on loss amount and its method of calculating the loss here are unsound. In recognition of the fraud guideline's unreliability, the substantial majority of securities and investment fraud defendants are punished with below-guidelines sentences. There is no reason that Jason should be treated differently.

This is especially so in light of the good works he has performed in other aspects of his life; the economic and reputational harm he has already experienced; the additional consequences in the parallel civil regulatory suit he still faces; the need to pay restitution, which he can only do once he serves his sentence; and, finally, the need to avoid potential disparity with Edwin, who stands to receive a non-incarceration sentence despite his integral role in this offense, largely because he was offered the opportunity to cooperate first.

Accordingly, we respectfully request that the Court sentence Jason significantly below the guidelines' recommendation.

---

[3] To this day, Edwin continues to publicly advertise himself as someone driven "to mentor and train others, breaking the myth that success requires sacrificing . . . values," who "empowers professionals and entrepreneurs to achieve the success they deserve in business and life without compromising what truly matters." About Edwin, https://edwincarrion.com/aboutedwin (last visited July 31, 2025). His personal website makes no acknowledgement of TTT's collapse, the pending CFTC suit, or his conviction here.

1. **The Guidelines Calculation.**

    The Court must begin by calculating Jason's advisory sentencing range under the United States Sentencing Guidelines. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)). The PSR estimates that Jason's guidelines range is 97-121 months, based upon a total offense level of 30 and a criminal history category of I. The government is advancing a lower range of 78-97 months, which reflects a total offense level of 28 and the same criminal history category—its estimate is lower because it is not requesting application of the leadership enhancement under U.S.S.G. § 3B1.1.

    Although the defense lodged objections to other enhancements, we have withdrawn them based on further discussions with the government. Accordingly, although we previously submitted that Jason's guidelines range should be lower, we are no longer disputing the government's estimate. The guidelines range is 78-97 months. But, for the reasons set forth below, the Court should sentence Jason substantially below that advisory range.

2. **The Court should sentence Jason significantly below the guidelines under 18 U.S.C. § 3553.**

    The Court is not bound to impose a sentence that the guidelines recommend. *Rosales Mirales v. United States*, 585 U.S. 129, 133 (2018); *United States v. Booker*, 543 U.S. 220, 264 (2005). Nor may the Court presume that the guidelines' recommendation is reasonable. *Cavera*, 550 F.3d at 189. Rather, the Court must obey "the parsimony principle, a broad command that instructs courts to 'impose a sentence sufficient, but not greater than necessary, to comply with'" the sentencing purposes of 18 U.S.C. § 3553(a)(2). *Dean v. United States*, 581 U.S. 62, 67 (2017). These are imposing a punishment that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment; deters the defendant and the public; protects the public from additional crimes by the defendant; and provides needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* § 3553(a)(2). In determining what sentence meets those ends, the court should consider the nature and circumstances of the offense and Jason's personal history and characteristics, *id.* § 3553(a)(1), the kinds of sentences available and the sentence recommended by the Sentencing Guidelines, *id.* § 3553(a)(3)-(4), and the need to avoid unwarranted disparities, *id.* § 3553(a)(6). Finally, the Court must consider and balance the need to provide restitution to harmed victims. *Id.* § 3553(a)(7).

    Here, we submit that the § 3553(a) factors favor a substantial downward variance from the guidelines' recommended range.

    A. **Jason is a first-time felony offender who is deeply remorseful for the harm he caused.**

    Jason was 33 years old when he and Edwin began TTT. Before then, there was little in his life to suggest that he would be involved in fraud. To the contrary, other than a misdemeanor relating to his abuse of alcohol, he lived a law-abiding life.

    Jason graduated high school in 2006 and obtained his associate's degree in business administration from Laguardia Community College in December 2010. PSR ¶¶ 84-85. He

5

fathered two daughters while he was still a teenager. They are now adults and, although they do not live close to him, he maintains an active and positive relationship with them. PSR ¶¶ 70, 72.

In July 2012, he began serving as a police officer with the NYPD. He served for seven years, until his resignation in October 2019. PSR ¶ 89. During his NYPD tenure, he was assigned to two Brooklyn precincts, the NYPD's warrant section, and a Queens public housing service area. During his service in approximately 2016, he sustained a back injury that prevented him from participating in active duty. *See* PSR ¶ 77. He ultimately resigned about three years later, after NYPD informed him that he either had to return to active-duty service or take disability leave. He believed he was medically unfit for active service and could earn more off disability in another vocation: daytrading. Nevertheless, until his retirement, he did his best to serve the Department despite his injury. "I remember him coming home in pain from his back injury while on duty, but still showing up with quiet strength," his sister Nicole Ferreira writes. Ex. A at 6.

While he was off duty in 2017, Jason experienced his only other brush with the law, when he was arrested for driving under the influence of alcohol. Jason pled guilty to the offense, a misdemeanor, and was sentenced to a $500 fine, revocation of his driver's license, and mandatory alcohol abuse treatment. PSR ¶ 59. At work, he was suspended for a month without pay for the arrest, but was allowed to continue his employment. His performance evaluations indicate that he was meeting departmental standards before and after the arrest.

Jason does have a history of excessive alcohol use, as his prior conviction demonstrates. He attended alcohol treatment in 2017 and 2018 as a condition of his guilty plea and his NYPD employment, but he has not attended treatment since. PSR ¶ 82. During his time with TTT, he drank to manage the stress of running the fund and keeping the company operational despite its losses. PSR ¶ 80. His drinking contributed to his serious lapses in judgment managing the company's trades and soliciting more capital under fraudulent pretenses. To his credit, Jason has been sober for the pendency of this case, notwithstanding the stress of pleading guilty and facing sentencing. PSR ¶ 83. Nevertheless, he may benefit from continued alcohol treatment in the future to prevent relapses.

There is nothing in Jason's personal history to suggest that he is predisposed to lie or steal. His family and remaining friends, rather, describe him as a trustworthy and standup man who has supported and inspired them. Jason's girlfriend, Kyhan Parveen, states that he chose to be a police officer because of his "selflessness" and "commitment to protecting those around him." *Id.* at 9. His sister, Nicole, adds that "Jason has always had a genuinely good heart." *Id.* at 5. "He's extremely smart and has a passion for helping people grow. He has a natural gift for motivating others, almost like a life coach. He challenges people to stop making excuses and reach higher. He's also known for being direct sometimes too honest but always sincere and focused on helping people better themselves." *Id.*

"There's a natural kindness and sincerity about him," his friend Yuly Alcantara concurs.

> He has played a quiet but powerful role in my personal growth. During moments when I doubted my path or felt overwhelmed by life's pressures, he reminded me of my worth, pushed me to stay focused, and helped me find clarity. He never gave

6

>advice with ego — just with heart, honesty, and genuine care. That kind of support is rare, and it's something I'll always be grateful for.

*Id.* at 1.

Another friend, Kujtim Dimas, recalls how Jason supported him during the pandemic, when his restaurant teetered on the verge of closing. "I entered a state of depression not knowing if my business would survive," Dimas writes. Jason "would answer all my frantic texts instantly, and workout every and all scenarios that could happen and how to combat it." *Id.* at 3. He "is the type of person the world needs," Dimas continues. "Someone who genuinely shows care for those around him and always look[s] to provide a hand in any which way he can." *Id.* at 4.

Jason accepted responsibility when he pled guilty to the indictment in November 2024. He likely would have pled guilty even sooner, but only did not because undersigned counsel needed time to receive and review the substantial discovery in the case. Beyond pleading guilty, however, Jason is genuinely remorseful for his crime. He deeply regrets creating and then trying to salvage his business by resorting to lies and misrepresentations. Even more, he feels terrible that many of TTT's victims were personal friends.

Jason's friends and family describe witnessing his contrition and private expressions of personal guilt and shame. Yuly Alcantar observes that "this past year has been incredibly difficult for Mr. Rodriguez and his family." Ex. A at 1. "Even without knowing every detail, I can feel the weight he carries—the toll this situation has taken on him emotionally and personally. It's heartbreaking to witness, because I know at his core, he is a good man. A man who has made mistakes, yes, but also someone with the strength and humility to learn from them." *Id.*

His sister, Nicole Ferreira, states that since TTT's collapse and his arrest, "Jason has gone through a true spiritual transformation" and is determined to right his wrongs. She relates that he has told her that "once this is all over, I'll do whatever it takes to pay everyone back even if it means flipping burgers." *Id.* at 7. His girlfriend, Kyhan Parveen, echoes this, noting that Jason frequently talks about how he want to "make everyone whole." *Id.* at 10.

Daniel Rodriguez, Jason's cousin, agrees that Jason is ready to make full amends.

>With honesty and remorse, Jason has laid bare his understanding of the harm caused, expressing a commitment to avoid such missteps in the future. Together, we have explored plans for counseling and the unwavering support of our tight-knit family, a network that stands ready to guide him. His resolve to remain on a lawful path is resolute, a promise born from reflection and a desire for redemption.

*Id.* at 12.

Jason is, in Nicole's estimation, "someone who still wants to carry his weight, no matter how heavy the circumstances are right now." *Id.* at 7. "It's clear that the weight of this entire experience has deeply impacted him emotionally, spiritually, and mentally. I can confidently say that he has already learned a hard and painful lesson." *Id.*

7

### B. TTT began as a well-intended, if fundamentally flawed company, but devolved into a fraudulent pyramid scheme.

As noted at the outset of this memorandum, Jason did not start TTT with the intent of committing a crime or defrauding his friends and lenders. He sincerely believed that the combination of his trading acumen and Edwin's business experience would yield a profitable investment fund. But he grossly overestimated his own trading skill and Edwin's management abilities. Jason could never consistently yield trading profits that were necessary to keep the company afloat. And Edwin had loaded the company with usurious interest-payment obligations that it could never realistically meet.

The result was a company destined to fail. Its first year of existence made this perfectly clear. The interest the company owed on its loans was more than double the profits it had earned. And the company dipped into the loan principal to make interest payments, thus compromising the reserve it purportedly maintained to guarantee the lenders against loss.

What Jason should have done at that moment was admit defeat, wind down TTT, and repay the company's lenders. Had he done so, and been honest about the company's shortcomings, he would have avoided criminal prosecution and civil and regulatory jeopardy. But he chose a different path. To keep the company alive, he and Edwin solicited more loans and lenders through false promises about how TTT invested its capital and managed its risk. He should never have crossed that moral and legal line to save his floundering company. Not just because it was against the law, though that should have been reason enough. Jason should not have lied because it was also an awful business decision. As more loans came in, the company's debt grew and its interest-payment obligations ballooned. And as the company took bigger and longer trade positions, its balance sheet tanked. Simply put, nothing good came out of Jason and Edwin's fraudulent statements. They only delayed TTT's eventual demise and increased the economic and legal consequences.

Jason realizes this now. And he knows that his conviction in this case was the result of pride and hubris. He did not want to admit to TTT's initial lenders that the company was failing. And he genuinely believed that if he got additional capital and made some strategic changes, he could revive and extend TTT's life and repay his lenders. The company's financial success, he hoped, would absolve him of the false statements. He now knows that was a poor wager. The company collapsed. His reputation is marred. He owes millions of dollars to TTT's lenders. And he put himself at risk of receiving a lengthy guidelines sentence.

### C. The fraud guidelines' advisory range is empirically unfounded and the Court should downwardly vary, as most district courts have done in similar cases.

Although the guidelines call for a sentence of at least seven-and-a-half years, we respectfully submit that this recommendation drastically overstates what is necessary to adequately punish Jason for his crime. As set forth below, the applicable fraud guideline, § 2B1.1, is empirically unfounded and routinely generates advisory sentencing ranges that exceed what is necessary to punish a defendant. For that reason, most judges in this district and across the nation do not follow the guidelines' advice in fraud cases like this. This Court should

reach a similar conclusion. A sentence well below the recommended range would be sufficient, but not greater than necessary, to satisfy the purposes of sentencing under § 3553(a).

The Court must consider the sentence recommended by the Sentencing Guidelines in imposing sentence. But it may vary downwardly from it, especially where there are policy reasons to doubt the Sentencing Commission's recommendation. *See Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007); *Cavera*, 550 F.3d at 191. This case represents an example where the guidelines' recommendation is indefensibly high.

There are two aspects of the fraud guideline that are unusual and yield an unreliable sentencing recommendation in this case. The first is the heavy weight the guideline assigns to the loss amount over any other factor. Here, the fraud guideline calls for an 18-level enhancement based on its calculation of the total loss, a more than 150% increase from the base offense level. In *United States v. Algahim*, 842 F.3d 796 (2d Cir. 2016), the Court of Appeals observed that the fraud guideline's structure—setting a low base offense level and then dramatically enhancing it according to the total loss—is "unknown to other sentencing systems." *Id.* at 800. "[I]ts unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* Specifically, *Algahim* instructs that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

The fraud guideline is not just anomalous, however. It is also empirically unfounded. In *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013), Judge Stefan Underhill, sitting by designation, observed that "[t]he loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Id.* at 379 (Underhill, J., concurring); *accord* Kate Stith*, The Arc of the Pendulum: Judges, Prosecutors, and the Exercise of Discretion*, 117 Yale L.J. 1420, 1476 n.235 (2008) ("[T]he Guidelines' 'loss'-penalty tables appear to have been created out of whole cloth, without either statutory or empirical basis." (citations omitted)). Rather, the loss table was produced by the Sentencing Commission in a series of amendments directed by Congress, each of which contributed to the upward inflation of the recommended sentence. *Id.* at 379-80. Because the loss table was the product of legislative fiat rather than the Commission's data-driven methodology, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Id.* at 379; *accord United States v. Dorvee*, 616 F.3d 174, 184-86 (2d Cir. 2010) (holding that district courts may vary from child-pornography guideline for similar reasons). Indeed, Judge Underhill warned that, due to the guideline's unusual pedigree and design, "[t]he higher the loss amount, the more distorted is the guideline's advice" and "the guidelines calculations in such cases are of diminished value to sentencing judges." *Corsey*, 723 F.3d at 380 (Underhill, J., concurring) (internal quotation marks omitted).

Numerous judges in the Eastern and Southern Districts of New York have sounded the same alarm. *See, e.g.*, *United States v. Black*, 16 Cr. 370 (CM) (S.D.N.Y. Oct. 24, 2019) (McMahon, J.), Doc. 457 at 56:5–16 (criticizing "utterly ridiculous" fraud guideline because it is "heavily weighted toward increasing the number of enhancement points" as the loss amount increases); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (condemning the "excessive weight on [the loss] factor" and noting that loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); *United States v.*

*Ovid*, 09 Cr. 216 (JG), 2010 WL 3940724, at *8 (E.D.N.Y. Oct. 1, 2010) (Gleeson, J.) (criticizing "the illusion of precise calculation created by the ever-expanding fraud guideline"); *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) (Block, J.) (criticizing fraud guideline's heavy weighing of loss as "black stain on common sense"). And district judges locally and nationally have acted on this skepticism by sentencing similarly situated defendants below the guidelines—often substantially below.

According to the Sentencing Commission's most recent snapshot of securities and investment fraud sentencings across the nation, approximately one-half of all such defendants receive downward variances. *See* Ex. B at 2 (showing that, of 53% of securities and investment fraud defendants who received variances in fiscal years 2019-2023, 96.2% received downward variances). For this group, the average sentence reduction was 46.9%, meaning that the average downward variance resulted in a sentence of about half the guidelines' bottom range. *Id.* Fewer than 20% of securities and investment fraud defendants received sentences within their guidelines ranges. *See id.* (showing that, of 47% of defendants sentenced under Guidelines, only 40.4% were sentenced within range, with remaining 59.6% receiving downward departures).

This trend bears out locally with respect to all defendants sentenced under the fraud guideline—a broader cohort than just securities and investment fraud. In the Eastern and Southern Districts of New York, guidelines sentences are infrequently imposed in cases, like Jason's, where the defendant is sentenced under § 2B1.1 and has a criminal history category of I. The table below, and appended in larger format as Exhibit C, shows that, since 2019, more than one-half of all similarly situated defendants have received downward variances, either as requested by the defense or the government.[4] Another 15 to 20% received downward departures, mostly for substantial assistance under § 5K1.1. Less than a quarter received sentences within the advisory range.

Sentence Imposed Relative to Guideline Range

| Sentence Range | 2015 N | 2015 % | 2016 N | 2016 % | 2017 N | 2017 % | 2018 N | 2018 % | 2019 N | 2019 % | 2020 N | 2020 % | 2021 N | 2021 % | 2022 N | 2022 % | 2023 N | 2023 % | 2024 N | 2024 % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total | 375 | 100.0% | 366 | 100.0% | 312 | 100.0% | 260 | 100.0% | 283 | 100.0% | 191 | 100.0% | 215 | 100.0% | 271 | 100.0% | 328 | 100.0% | 308 | 100.0% |
| Within Range | 80 | 21.3% | 90 | 24.6% | 71 | 22.8% | 66 | 25.4% | 61 | 21.6% | 35 | 18.3% | 39 | 18.1% | 45 | 16.6% | 38 | 11.6% | 73 | 23.7% |
| Upward Departure | - | | - | | - | | 2 | 0.8% | - | | - | | - | | - | | 1 | 0.3% | - | |
| §5K1.1 Substantial Assistance | 77 | 20.5% | 90 | 24.6% | 87 | 27.9% | 36 | 13.8% | 54 | 19.1% | 29 | 15.2% | 33 | 15.3% | 35 | 12.9% | 59 | 18.0% | 45 | 14.6% |
| Downward Departure Govt Motion | - | | 7 | 1.9% | 1 | 0.3% | 4 | 1.5% | - | | - | | 4 | 1.9% | 6 | 2.2% | 3 | 0.9% | 1 | 0.3% |
| Non-Govt Downward Departure | 19 | 5.1% | 24 | 6.6% | 11 | 3.5% | 12 | 4.6% | 7 | 2.5% | 4 | 2.1% | 4 | 1.9% | 6 | 2.2% | 3 | 0.9% | 9 | 2.9% |
| Upward Variance | 2 | 0.5% | 1 | 0.3% | 4 | 1.3% | 1 | 0.4% | 4 | 1.4% | 2 | 1.0% | 1 | 0.5% | 1 | 0.4% | 3 | 0.9% | 2 | 0.6% |
| Downward Variance Govt Motion | 7 | 1.9% | 8 | 2.2% | 14 | 4.5% | 13 | 5.0% | 13 | 4.6% | 15 | 7.9% | 14 | 6.5% | 25 | 9.2% | 34 | 10.4% | 25 | 8.1% |
| Non-Govt Downward Variance | 190 | 50.7% | 146 | 39.9% | 124 | 39.7% | 126 | 48.5% | 144 | 50.9% | 106 | 55.5% | 120 | 55.8% | 153 | 56.5% | 187 | 57.0% | 153 | 49.7% |

---

[4] This table was produced using the United States Sentencing Commission's Interactive Data Analyzer. *See* https://ida.ussc.gov/analytics/saw.dll?Dashboard. Specifically, this was obtained under the Guideline Application field using the following filters: Fiscal Year: 2015 - 2024; Circuit: All; State: All; District: New York, Eastern,New York, Southern; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: All; Guideline: §2B1.1; Drug Type: All; Criminal History: I; Career Offender Status: All.

    To give just one example of this skepticism in action, the Court should consider Judge Garaufis's opinion in *United States v. Johnson*, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018), where he explained why he sentenced the defendant to two years' imprisonment, despite facing a fraud guideline range of 87-108 months. Judge Garaufis adopted the reasoning of *Algahim* and Judge Underhill's *Corsey* concurrence, *id.* at *4, and concluded that, even despite the defendant's abuse of trust and obstruction of justice, a sentence of nearly one-quarter of the bottom of the guidelines range was sufficient. In particular, the court stressed that two years' imprisonment was "a serious amount of prison time" and enough when "combined with the expense and emotional harm that may have resulted from this prosecution," "the disgrace of having been convicted of a felony," and the high likelihood that the defendant would never reoffend because "financial institutions will never again trust him to participate in the financial-services industry." *Id.* at *5.

    *Johnson* and the above sentencing data are telling. They show that, locally and nationally, district judges tend to view the fraud guideline as excessive for securities and investment fraud defendants—especially for those, like Jason, who fall within the guidelines' lowest criminal history category. Accordingly, only a minority of similarly situated defendants receive guideline sentences. And when district judges vary downwardly for securities and investment frauds, which they do more often than not, they on average impose only about half of what the guidelines recommend.

    The Court should be similarly skeptical of the fraud guideline's application here. Indeed, it should conclude, as most district courts do, that § 2B1.1 goes far beyond what is necessary to achieve the purposes of sentencing.

    In addition to doubting the fraud guideline's prioritizing of the loss amount, the Court should also view skeptically the way that § 2B1.1 calculates loss in this case. Here, the guidelines recommend an 18-level increase based upon a loss amount of over $3.5 million even though the victims in this case only lost approximately $3.4 million. *See* PSR ¶ 26. The reason for the discrepancy is the guideline's commentary providing that the loss amount is to be reduced by "the money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim *before the offense was detected*." U.S.S.G. § 2B1.1 cmt. n.3(D)(i) (emphasis added). The note further explains that the time of detection is "the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." Here, the defense does not dispute the government and Probation Department's proposed time of detection of April 16, 2022. *See* PSR ¶¶ 27-28.

    As a result of this commentary's application, approximately $662,000 in payments made to TTT's lenders are not credited toward his loss amount. This pushes the total figure over the $3.5 million threshold, raising his total offense level two higher than it otherwise would have been. The upshot: this quirk in the fraud guideline's loss-amount calculation increases the bottom of Jason's range by 15 months. But there is no empirical or convincing policy reason to ignore these hundreds of thousands of dollars that TTT repaid its lenders.

    The "time of detection" commentary was added in Amendment 617 to the Sentencing Guidelines on November 1, 2001. *See United States v. Caldwell*, 302 F.3d 399, 418 (5th Cir.

11

2022) (discussing history of "time of detection" amendment). The Commission included this commentary note to address a problem this case does not present: where the money, property, or service rendered to the victim is difficult to value. It explained, in relevant part:

> The amendment adopts "time of detection" as the most appropriate and least burdensome time for measuring the value of the transferred benefits. *The Commission determined that valuing such benefits at the time of transfer would be especially problematic in cases in which the offender misrepresented the value of an item that is difficult to value.* Although the time of detection standard will allow some fluctuation in value which may inure to the defendant's benefit or detriment, the Commission determined that, because the time of detection is closer in time to the sentencing and occurs at a point when the authorities are aware of the criminality, *its use generally would make it easier to determine a more accurate value of the benefit.*

U.S. Sentencing Comm'n, [Amendment 617 to the U.S. Sentencing Guidelines](#) (Nov. 1, 2001) (emphases added).

Here, there was no difficulty in valuing the benefit that TTT provided its lenders after April 16, 2022. The interest payments were all made by checks or bank transfers in dollar denominations. The records were maintained by banks. And the payments were easily verifiable. Indeed, the loss amount chart presented at paragraph 26 of the PSR—which includes the payments made after April 16, 2022—was created by consulting these very sources.

Because the "time of detection" commentary addresses a problem absent from this case, the Court should independently vary downwardly to discount its application here. There is no valid reason, other than the fraud guideline's say-so, to ignore these substantial payments to TTT's lenders. Jason should therefore get full credit for these payments under § 3553(a). This would reduce the total loss to the accurate amount of approximately $3.4 million.

### D. A substantial downward variance is sufficient but not greater than necessary to serve the purposes of sentencing.

Based on the analysis above, the Court should begin by granting a two-level variance to give Jason full credit for the payments that TTT made to its lenders. That would reduce Jason's sentencing range to 63-78 months. The Court should then apply a downward variance that is consistent with the average sentence reduction that is granted in the majority of securities and investment fraud cases. That would be approximately half of the bottom of the reduced guidelines range, which would be 31-32 months.

But the Court should not stop there. An above-average variance is appropriate for Jason for the following reasons.

*First*, Jason has already suffered punishment as a result of his commission of this crime. He lost all his money and, today, has no assets. He lost scores of friends: the victims who loaned TTT money and more who refuse to associate with him after the fund's demise and his arrest. His reputation is destroyed. The life he had tried to build is in tatters. The economic and reputational damage that Jason has already sustained diminishes the need for lengthy

imprisonment to afford just punishment and reflect the seriousness of the offense. *See* 18 U.S.C. § 3553(a)(2)(A).

*Second*, regardless of whatever sentence the Court imposes, Jason is highly unlikely ever to reoffend again. As discussed above, he is sincerely remorseful, determined to make amends, and resolved to never again put himself in this legal jeopardy. But even if he were not, it likely would be impossible for him to commit this sort of crime in the future. His conviction will dissuade financial institutions from accepting his business or employing him. And he faces additional prohibitions in the pending regulatory suit against him. There, the CFTC is seeking a permanent injunction prohibiting him from ever trading commodities, including foreign currency transactions, in his own name or on behalf of anyone else. *See* Complaint at 46-49, *CFTC v. Technical Trading Team, LLC, et al.*, No. 23-cv-7296 (RER), ECF No. 1 (E.D.N.Y. Sept. 29, 2023). In all probability, that injunction or one like it will enter against Jason. Accordingly, a lengthy prison term is not necessary to achieve specific deterrence or to protect the community from future crimes. *See* 18 U.S.C. § 3553(a)(2)(B)-(C).

Nor is a lengthy sentence necessary for general deterrence. Prior sentencings in similar cases demonstrate this. For example, in *Johnson*, the court found that a sentence of 24 months' imprisonment "makes it clear that all defendants who commit fraudulent acts . . . are subject to serious sanctions." 2018 WL 1997975, at *5. In *United States v. Cronin*, No. 17-cr-190 (RJD), the court found that 24 months' imprisonment was enough to achieve general deterrence where the defendant defrauded his employer of more than $1.5 million dollars and lied to the IRS about his income. In *United States v. St. Lawrence*, No. 16-cr-259 (CS) (S.D.N.Y.), 30 months' imprisonment—a variance of more than 100 moths—was enough to deter other public, where the defendant defrauded municipal bondholders of nearly $3 million, ruining his municipality's credit rating and subjecting his constituents to higher tax burdens for years. In *United States v. Thompson*, No. 19-cr-698 (ER) (S.D.N.Y.), one day's imprisonment was enough for general deterrence where the defendant was involved in two fraudulent schemes causing over $3 million in losses. And in *United States v. Obracanik*, No. 17-cr-144 (RA) (S.D.N.Y.), a year's imprisonment was enough to deter the public where the defendant defrauded his employer, JP Morgan Chase, of nearly $5 million. As these examples show, a sentence well below the guidelines range can be sufficient to communicate to the public that fraud will not be tolerated, even where the defendant caused large losses.

*Third*, perhaps the most important part of Jason's punishment will be making restitution to his victims. According to the government's most recent calculation, Jason will have to pay approximately $2.5 million to make his lenders whole. And that is on top of the money he separately will owe in forfeiture. Jason needs to start working again so he can pay the victims in this case, an obligation he takes very seriously, as his friends and family report to the Court. *See* Ex. A at 7 ("[H]e humbly accepted the help and told us, 'Once this is all over, I'll do whatever it takes to pay everyone back even if it means flipping burgers.'"); *id.* at 10 (describing Jason's "goals of not only repaying and making 'everyone whole' (words Jason uses often) but also to continue the legacy of his grandfather"). He has been unemployed while this case is pending but intends to rejoin the workforce, and begin the long process of repaying TTT's lenders, once he completes his incarceration. A shorter prison term will allow him to begin making restitution payments sooner.

*Fourth*, a below-guidelines sentence will avoid unwarranted disparities. *See* 18 U.S.C. § 3553(a)(6). As discussed above, granting a significantly below-guidelines sentence would be consistent with the local and national sentencing practice for security and investment fraud defendants like Jason. Our requested variance will also prevent undue disparity between Jason and Edwin. *See United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (district court is permitted to consider disparities between codefendants' sentences).

Although Edwin has not been sentenced yet, he stands to receive a significantly reduced sentence—indeed, potentially no prison time at all—because he provided substantial assistance to the government against Jason. *See* Ex. B at 2 (showing that, on average, § 5K1.1 securities and investment fraud defendants receive 76.4% reduction from guidelines range). But Edwin's cooperation was, to an important extent, a matter of happenstance: the government approached Edwin first and gave him the opportunity to cooperate against Jason. Had the timing been reversed, Jason likely would have offered the same type of assistance against Edwin. But by the time Jason was charged, he had no information to provide that would assist the government, since Edwin had already admitted everything about TTT.

Even though Edwin has not been sentenced yet, and it is unknown what punishment the Court will impose, we respectfully request that the Court temper Jason's sentence to avoid potential future unwarranted disparity with him. Jason and Edwin were equal partners in this conspiracy. Edwin was integral to forming TTT, creating the pyramid loan structure, drafting and distributing the false statements to lenders, and, despite his purported business experience, keeping the company going through illegal means once it was obvious TTT was destined to fail. Jason's sentence should therefore be proportional to Edwin's, especially where Edwin's cooperation and additional sentencing reduction resulted from timing beyond Jason's control.

### 3. Conclusion.

Jason Rodriguez tried to build his own investment company. He failed spectacularly. Worse, he broke the law while trying against the odds to make TTT work. He has already been punished economically and reputationally for defrauding his lenders. And he will likely spend the rest of his life working to repay their principal. The lengthy term of imprisonment that the guidelines prescribe will not meaningfully achieve deterrence, rehabilitate him, or make TTT's lenders whole. Nor is it necessary for just punishment or to deter the public, as evidenced by the overwhelming number of similarly situated defendants locally and nationally who are sentenced significantly below the guidelines' recommendation.

A substantial variance is appropriate for this chastened and humbled man. We respectfully submit that a sentence of no more than two years' imprisonment should be imposed, to be followed by a period of supervision to ensure that Jason begins the long process of compensating the victims for their losses. That sentence is sufficient but not greater than necessary to achieve the purposes of sentencing.

Respectfully submitted,
/s/
Benjamin Yaster
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
(718) 330-1208
*Counsel for Jason Rodriguez*

Encls.  Exhibits A-E

cc:     Benjamin Weintraub, AUSA (via ECF)
        Nicole Gervase, Probation Dep't (via email)